LAW OFFICES OF MARY ELLEN TERRANELLA
Mary Ellen Terranella - State Bar No. 99272
609 Jefferson Street, Suite G3
Fairfield, California 94533
(707) 428-1778
Facsimile (707) 446-6777

Attorney for Debtor

# UNITED STATES BANKRUPTCY COURT

## EASTERN DISTRICT OF CALIFORNIA
### Sacramento Division

In the Matter of

LISA SAHAR

    Debtor

_____

LISA SAHAR

    Plaintiff

v

U.S. DEPARTMENT OF
EDUCATION, et al.

    Defendants

Case No. 20-20726-E-7

Chapter 7

Adversary Proc No. 20-02123-E

Docket Control No. USA-1

**OPPOSITION TO MOTION FOR SUMMARY JUDGMENT**

Date: July 1, 2021
Time: 11:00 A.M.
Courtroom 33, 6th Floor
Judge: Ronald H. Sargis

    Debtor, Lisa Sahar, by and through her attorney, Mary Ellen Terranella, hereby opposes the Motion for Summary Judgment, and in support thereof alleges as follows.

## PROCEDURAL HISTORY

1. The debtor filed her voluntary petition on February 9, 2020.

1

2. Debtor's 341 meeting of creditors was concluded on May 4, 2020.

3. Debtor filed her Complaint to Determine Dischargeability of Debt on June 24, 2020.

4. The Discharge of Debtor was entered on July 13, 2020.

5. The Default of Defendant was entered on August 12, 2020.

6. The Stipulation to Set Aside Default was entered on August 24, 2020, due to Defendant claiming his staff had not routed the Complaint to the proper department timely.

7. The Order Vacating Entry of Default was entered on September 3, 2020.

8. Defendant filed its Answer on September 3, 2020.

**ARGUMENT**

**A. Defendant's Statement of Facts**

Debtor first disputes Defendant's Statement of Facts, which offer conclusory statements that are not correct. Defendant states authoritatively that debtor "has no medical conditions that affect her ability to work", pointing the Court to the Transcript of Deposition of Lisa Sahar, at 49:10-24. At 49:1-3, debtor states she cannot do anything that involves "picking up heavy stuff". At 49:13-17 she states she cannot work as a chiropractor and that lengthy computer screen time triggers pain. She does state that she has no "medical opinion" that states she cannot do certain work tasks, but, as defendant points out, the debtor has a Doctor of Chiropractic degree. She is more than qualified to assess her own physical health. As she described in her testimony, she has chronic neck and shoulder pain, radiating down her arm and numbing her fingers. The other medical condition at 49:21-25 was more fully explained in debtor's Response to Request for Interrogatories, provided to defendant on November 16, 2020. The debtor has uterus prolapse and cannot be on her feet more than 3-4 hours per day. The debtor has provided to defendant medical records of her diagnosis in 2017 of mild degenerative disease at C5-6. That diagnosis report is attached hereto as Exhibit A. The debtor's condition has not improved and may require surgery in the future. The debtor is on several prescription medications, including Hydrocodon since 2017 for pain, Gabepentin since 2018 for relief of nerve pain, Hydroxyzine since 2019 for anxiety and Fluozetine since May 2021 for depression. Prescription drugs are not prescribed

unless a medical doctor determines a diagnosis requiring them. Defendant's cursory statement that debtor has no medical conditions that affect her ability to work is dismissive of debtor's own testimony and contradicts the documentation she provided to defendant.

Defendant further states in its Statement of Facts that the Family Court issued a Gavron order advising debtor that, under Family Code section 4330, she is required to make reasonable efforts to provide family support by obtaining gainful employment, and imputed monthly income to her of $4,831.00. Debtor must clarify that it was debtor's ex-husband who requested the Family Court issue a Gavron warning when he filed yet another request to decrease his support payments. In an Order entered on January 22, 2020, the Court denied the request to reduce the support payments (it was the ex-husband's third request for a reduction in one year), as no supporting income and expense documentation was provided. The Order specifically indicates that the ex-husband requested the Court issue a Gavron warning to the debtor. The Court actually issued the Gavron warning to *both* parties, not just the debtor. The Court acknowledges in the Order that the imputed monthly income of $4,831.00 to the wife is *higher* than her actual income. The Court found that it is "reasonable for the Wife to pursue a new career with lower barriers to entry, such as teaching. At the time of separation, the Wife was not working as a chiropractor and had not done so for many years. In giving this advisement, the Court is not mandating changing her career pursuit; rather, the Wife is merely directed by law to continue to pursue self-sufficiency." The Court concludes, "In making these orders related to spousal support, the Court has considered factors set forth in Family Code section 4320, including the fact that the Wife stayed home and served as the primary care provider for the children and sacrificed her career as a medical professional while the Husband acted as primary income earner and provided financially for the family, thereby advancing his career and providing an ongoing stable source of income post-dissolution." (see attached Order, Yolo Superior Court for the State of California Case No. CV-FL-15-1669, Exhibit B). The debtor and her ex-husband were both born in Afghanistan and immigrated to the United States as children with their parents. There are certain cultural aspects of their backgrounds that favor patriarchal dominance. Ms. Sahar

stopped working when she had children because her husband told her to do so. It was Ms. Sahar's ex-husband who decided that teaching would be an acceptable field for Ms. Sahar when she did return to work.

Defendant speculates in its Statement of Facts that debtor's support payments from her ex-husband could increase. Debtor disputes this. Her ex-husband has already had the spousal support decreased twice. And, child support was decreased by $640.00 last year when the couple's oldest child turned 18. It will further decrease when the now 17 year old turns 18 and again when the 14 year old turns 18. The debtor's ex-husband is currently on disability. In December 2020, he unilaterally decreased his support payment, paying only the Court-ordered child support of $2,442.00, ceasing payment of the Court-ordered spousal support altogether. He continues to pay just the child support. In May, his support payment check bounced (see attached bank notification, Exhibit C). There is absolutely no certainty that debtor will receive more support from her ex-husband; nothing so far suggests otherwise. The "potential" income stated by defendant of $9,431.00 is not based in any reality.

Defendant's view appears to be that, because debtor's ex-husband is a doctor, she should be able to get higher support payments from him. The debtor's divorce was extremely long and contentious. One of the many reasons the debtor filed for bankruptcy was overwhelming legal fees associated with the divorce and custody issues. Those fees were $165,314.00. Already the ex-husband is in contempt of court ordered support payments by unilaterally ceasing payment on the spousal support. But defendant assumes debtor can somehow manage to retain legal counsel to represent her in Family Court every time her ex-husband fails to comply with Court orders. As the debtor described in detail during her deposition, she is a survivor of domestic abuse. The thought that she will have the fortitude, let alone the finances, to go back to Court throughout her life to either get the support that she has already been awarded, or petition for higher support is simply not realistic.

Finally, Defendant states debtor is currently employed as a fully certified teacher. As the debtor indicated during her deposition, she has not obtained a contract with the private school

where she teaches for the 2021-2022 school year. After the current school year ends, she will be jobless. She is certainly looking for a permanent job, and will substitute teach if need be, but her future employment is not certain.

### B. Legal Standards for Summary Judgment

The legal standard for Summary Judgment requires the moving party to show that there is not genuine dispute as to any material fact. As debtor has clearly shown in both testimony, production of documents and interrogatories, and her Declaration filed herewith, there are certainly genuine disputes as to whether or not she is eligible for discharge of her student loans. Debtor's Complaint to Determine Dischargeability of Debt is not meritless. The debtor will be 50 years of age in October. Her salary as a full time teacher is $46,000.00. She has 3 children residing at home with her. She has custody of the children. Her spousal support is $1,475.00 per month. Her child support is $2,442.00 and decreases as each child turns 18. Two of her children are under the age of 18 currently, although one is now 17. Debtor's ex-husband has unilaterally stopped paying the Court-ordered spousal support of $1,475.00. As a survivor of domestic abuse, she is fearful of taking him to Court to enforce current orders, let alone seek additional spousal support. She does not yet have a job for the 2021-2022 school year. She suffers from chronic pain caused by degenerative disease of the C5-6 vertebrae. She has been treated for this since 2017. She requires prescription pain killers to function, as well as prescriptions for nerve pain, anxiety and depression. The debtor does not live an extravagant lifestyle. Her rent alone, however is $2,085.00 per month, which is the going rate for rentals in Davis. She surrendered a Mercedes Benz (purchased while she was married) during her bankruptcy case to reduce expenses, and now drives a Honda. She is earning well below the median income for a household of four and she does not yet have a job lined up for the fall. She has Covered California for her health insurance as she cannot afford the deductions for the health insurance offered by her current employer. These are all issues that should and must be allowed to go forward at trial.

### C. Presumption of Nondischargeability

It is clear that there is a presumption of nondischargeability as to student loans. This was not always the case. Until 1976 all student loans were dischargeable in bankruptcy. When the Commission on Bankruptcy Laws in the United States was formed in 1970 to study ways to reform the bankruptcy system, the modern day problems of student loan debt and out-of-control tuition were yet to materialize. For example, in-state UC tuition has increased by over 2000% since 1970.

The first student loan reforms took place in 1976 as an amendment to the Higher Education Act and required debtors to wait 5 years from the beginning of their repayment period before seeking a discharge through bankruptcy. The 5 year bar was extended to 7 years in 1990. Also in 1990, 523(a)(8) was amended to expand the discharge exception to apply to more than just educational "loans" to include any "educational benefit, scholarship, or stipend payment". And, in 1998, the laws were changed to provide that governmental student loans could never be discharged absent a showing of undue hardship. Finally, in 2005, under pressure from lenders and lobbyists, the BAPCPA reforms made all educational loans, public and private, nondischargeable absent a showing of undue hardship.

For years after the 1976 revisions to the Code, bankruptcy courts grappled with the "undue hardship" language of section 523(a), there being no definition or guidance in the Code as to how, precisely, this should be determined. In 1987, the Second Circuit decided *Brunner v. N.Y. State Higher Education Service Corp.*, 831 F.2d 395, 396 (2d Cir. 1987). The Court devised a three prong test to determine or define "undue hardship". The debtor must show 1) he cannot afford to repay the student loan and still maintain a minimal standard of living for himself and his family, 2) that this state of affairs is likely to persist for a significant portion of the repayment period and 3) the debtor has made a good faith effort to repay the loan. This test has been adopted by many courts, including the 9th Circuit in *United Student Aid Funds, Inc. v Pena (In re Pena)*, 155 F.3d 1108, 112 (9th Cir. 1998) in 1998. It is very important to note several things about the *Brunner* case. First, it was decided when private student loans were dischargeable without any time bar, and government student loans were dischargeable so long as

it had been at least 5 years between the date repayment first commenced on the loan and the date the bankruptcy was filed. The debtor in the *Brunner* case could have discharged the loan simply by waiting the requisite 5 years. Additionally, the debtor in *Brunner* filed her bankruptcy case just a few months after she had obtained her master's degree, immediately after the grace period before payments became due expired, after only a few months of unemployment, and having made no efforts to pay anything on the loans. Given these circumstances, it is understandable that the Court developed a fairly rigorous test for showing "undue hardship". However, the differences between student loan indebtedness in 1987 (Ms. Brunner's student loan debt was $9,000.00 and the Pena debt was $9,300.00), and the burden the majority of people now carry in student loan debt are staggering.

　　　　These differences are not lost on a growing number of bankruptcy and appellate panel judges. Judge Pappas' concurring opinion in *Roth v Educ. Credit Mgmt. Corp. (In re Roth)*, 490 B.R. 908, ___ (9th Cir. BAP 2013) is relevant and direct. He states, "I write separately to highlight that the analysis required by Pena/Brunner to determine the existence of an undue hardship is too narrow, no longer reflects reality, and should be revised by the 9th Circuit when it has an opportunity to do so. Put simply, in this era, bankruptcy courts should be free to consider the totality of a debtor's circumstances in deciding whether a discharge of student loan debt for undue hardship is warranted." He further states that the *Brunner* test for determining undue hardship is "truly a relic of times long gone." Judge Pappas points out that, when the *Brunner* case was decided, bankruptcy courts were required to focus on a debtor's circumstances only during the 5 to 7 years after student loans became due. After the amendments in 1998, the relevant time frame for examining a debtor's ability to repay or whether he or she had made a good faith effort to repay a student loan had no limits. Now, bankruptcy courts must try to predict a debtor's potential to repay a six figure educational obligation over his or her entire lifetime. The *Brunner* test requires debtors to prove that their current lack of ability to repay will persist for much of their lives – basically requiring a debtor to prove his or her financial future is hopeless.

7

Additionally, the amounts in controversy at the time *Brunner* was decided were much lower than what the courts see today. Then, if a student loan were excepted from discharge, the debtor could generally be expected to have the ability to repay it within a reasonable time. The *Brunner and Pena* loans were under $10,000.00. By contrast, the debtor in *Roth* was a 64 year old woman, whose student loan debt was over $95,000.00 (she originally borrowed $33,000.00), and the loans were decades old by the time she filed her bankruptcy case. The issue in the *Roth* case was whether or not the debtor had met the 3rd prong of the *Brunner* test, the good faith effort to repay. That good faith effort is looked at in terms of debtor's efforts in maximizing income and minimizing expenses. Creditors in student loan cases often point to a debtor's failure to negotiate or accept a repayment plan, such as the Income Based Repayment Plan, as evidence of lack of good faith effort, but courts have ruled that this, alone, is not de facto evidence of a lack of good faith. As Judge Pappas pointed out, some of the long term repayment plans can be thirty years or more – longer than some mortgage loans – and, after successful completion of the repayment plan, there may be a devastating debt-forgiveness tax consequence. This is surely not what Congress intended in enacting section 523(a)(8).

### D. Debtor Has Met Her Burden to Show Undue Hardship

Defendant again makes conclusory statements in deciding the debtor has not met her burden of showing undue hardship. Defendant assumes that, because debtor has a Doctor of Chiropractic degree, that must mean she can actually practice as a chiropractor. As the debtor clearly explained in her deposition, she has not worked in the chiropractic field for decades. She would have to go back to school to get recertified. Although she does have this degree, it is useless to her in an employment sense as she cannot physically do this kind of work. She has severe chronic pain in her neck and shoulder that would prevent her from performing the physical manipulations required of chiropractors. Defendant appears to discount all of these medical issues on the basis that the debtor has "failed to support these claims with any expert medical evidence". Debtor points out that there is no requirement that health issues be confirmed by a medical expert. However, the debtor has provided to defendant her initial

diagnosis of degenerative disease of C5-6, which was prepared by debtor's then physician, Cydney Marie Mahoney. Additionally, as defendant has acknowledged, the debtor has a Doctor of Chiropractic degree. She is not simply a lay person describing her health issues; she is educated in the medical field and has more than a passing knowledge of her medical issues. It appears defendant wishes for the debtor to find the resources to hire expert witnesses to confirm diagnoses already made; she does not have those resources.

   The debtor will be 50 years of age in October. She has 3 children at home, one over the age of 18. Although she is entitled to Court-ordered spousal support in the amount of $1,475.00, her ex-husband unilaterally stopped making this payment in December 2020. Spousal support was originally $3,000.00 per month, then debtor's ex-husband went back to court and got it reduced to $2,121.00 per month, then he went back to court again and got it reduced to the current $1,475.00. He attempted to reduce it again in January 2020, but the court denied that further reduction request. The debtor does receive child support for her two younger children, in the amount of $2,442.00, although this will decrease when her 17 year old turns 18, and end entirely when her 14 year old turns 18. The debtor's ex-husband is currently on disability. In May he bounced his support check. Although the Family Law court imputed income to the debtor of $4,831.00, it also acknowledged that she does not earn that much from her job. The debtor explained in detail in her deposition that she and her attorney provided to the Family Law court what they believed a teacher would earn, from information gleaned from a website, but that she has never earned that much. At 62: 1-25. The debtor has provided as Exhibits her current income and expense schedules, which clearly show she cannot maintain a minimal standard of living for herself and her dependents if forced to repay her student loans, meeting the first prong of the *Brunner* test.

   The debtor is almost 50 years old. She has chronic, diagnosed health issues. These health issues prevent her from using her Doctor of Chiropractic degree. She obtained her teaching credential and has been working as a teacher since 2012. She has worked mostly as a substitute teacher but was employed full time at a private school for the 2020-2021 school year,

9

at a salary of approximately $46,000.00 per year. Her most recent pay advices are attached as Exhibit F. However, she does not have a position yet for the 2021-2022 school year, despite numerous applications and interviews. Her attached tax documents show she earned $5,794.96 in 2017, $4,209.99 in 2018 and $5,595.00 in 2019 and $19,511.00 in 2020 from teaching (see attached W2 forms, Exhibit G). Her teaching job in 2020 was her first full time position; she was a substitute teacher in the prior years. Her spousal support has decreased since her divorce and is now not being paid at all. Her child support decreased when her eldest child turned 18 in 2020. She will eventually lose all child support. Her current spousal support is $1,475.00 per month, but she would have to go back to Court to enforce that court-ordered payment. This combined with her teaching income still puts her below median income. She will not get younger or more employable in the future and will continue to address both health issues as well as issues with an ex-husband who does not comply with court orders. She has met the second prong of the *Brunner* test.

It is hard to imagine a debtor who meets the third prong of the *Brunner* test as definitively as Ms. Sahar. Her student loans were originally about $60,000.00, taken out in 1996-1999. Ms. Sahar paid this *entire sum* back to the Department of Education on those loans, plus interest. Debtor estimates she has paid the Department of Education approximately $80,000.00 since she took out those loans, primarily during the time she was married to her ex-husband. But, due to interest, the current balance is approximately $175,570.00. The interest rate is 8.25%. Defendant conveniently ignores the significant payment Ms. Sahar has made on her loans, instead arguing she does not meet the third prong of the *Brunner* test because she is not currently in an Income Based Repayment Plan. Ms. Sahar did previously participate in the Income Based Repayment Plan, qualifying for $0 per month payments, but, of course, this has not changed the balance. Although defendant states Ms. Sahar is "refusing" to participate in the Income Based Repayment Plan, she has simply recognized that such a plan will not address the loan, which will continue to hang over her head and accrue interest. Defendant wants her to participate in an Income Based Repayment Plan, even if it means she pays $0 per month to the

10

Department of Education. Why? If it is clear to defendant that debtor qualifies for a $0 repayment plan, why won't it agree that the debtor cannot afford to pay the loan and allow it to be discharged? Ms. Sahar has made, over the years, significant payments on her student loans, in a good faith effort to repay. She simply cannot afford to do so now or in the foreseeable future.

## CONCLUSION

Debtor contends the Statement of Undisputed Facts filed by defendant is very much disputed. The "facts" do not support defendant's motion for summary judgment. Debtor has shown, even preliminarily, that there are genuine issues as to material facts. Debtor contends, and will prove at trial, that she has met the three prongs of the Brunner test.

WHEREFORE, DEBTOR PRAYS that defendant United States Department of Education's Motion for Summary Judgment be denied, and for such other and further relief as the Court deems just and proper.

Dated: 06/07/2021

Mary Ellen Terranella
Attorney for Debtor

11